**Affirmed and Memorandum Opinion filed January 31, 2019.**



In The

# Fourteenth Court of Appeals

### NO. 14-18-00777-CV

### IN THE INTEREST OF N.R. AND J.R., II., CHILDREN

**On Appeal from the 300th District Court**
**Brazoria County, Texas**
**Trial Court Cause No. 90413F**

## M E M O R A N D U M   O P I N I O N

In this appeal from a non-jury trial culminating in the termination of parental rights concerning two children, Father argues that (1) the evidence conclusively establishes that he complied with the Department of Family and Protective Services' ("the Department's") family services plan, and (2) the evidence is legally and factually insufficient to support the trial court's finding that termination is in the children's best interest. Father's alleged failure to comply with the family services plan was only one of three grounds on which his parental rights were terminated. Because Father does not challenge the trial court's findings concerning the other two

grounds for termination, and because the evidence is legally and factually sufficient to support the trial court's best-interest finding, we affirm.

## I. BACKGROUND

Father's son Jerry[1] was born in the autumn of 2014. When Jerry was six months old, Father was arrested for possession of cocaine and given two years' deferred probation. That same year, Father was placed on probation for possession of marijuana.

Father's daughter Nadine was born in July 2016. The month before Nadine was born, Father tested positive for methamphetamines; a month after she was born, law-enforcement personnel were called to the house after Mother struck Father in the head with a hammer. When the officers arrived, Nadine was in a room with Mother, and Mother still had access to the hammer. Mother was sent to the Mental Health and Mental Retardation Administration. Within a week, law-enforcement personnel again were called to the home because Mother was having a manic episode.

### A. The Initial Placement

In September 2016, Father, Mother, both grandmothers, Family-Based Safety Services caseworker Carla Burgess, Burgess's supervisor, and another caseworker attended a "family team meeting." Burgess testified at trial that Father admitted during the meeting that he was using methamphetamine two or three times a week "[f]or energy for his job," and that he had a history of cocaine and marijuana use. Although Father had been diagnosed with bipolar disorder ten years earlier, he was receiving no medication or other treatment at that time. Mother has more severe

---

[1] To increase readability while protecting the children's identities, we refer to the children by pseudonyms, which we have drawn from the National Hurricane Center's 2018 and 2019 lists of tropical-cyclone names having the same first initial as the children's respective names.

bipolar disorder, and at the family meeting, Mother was psychotic and delusional. The parents agreed to place the children with their maternal grandmother while Father and Mother worked on their substance-abuse and mental-health issues.

## B.      Events After the Children's Return

By November 10, 2016, Father had completed his drug and alcohol treatment and Mother had been stabilized by medication, so the children were returned to their parents. The family lived with Father's mother, who was to monitor the children's safety. The Department was unaware at that time that the children's paternal grandmother has a history of drug use and a prior assault conviction.[2]

After the children's return, Father's substance abuse continued. According to statements Father made during later psychological testing, he used methamphetamine again in December 2016. In February 2017, Burgess conducted an unannounced home visit while the children were at daycare, and both parents appeared to her to be under the influence of drugs. Father's mother told Burgess that both parents had used synthetic marijuana on multiple occasions since the children's return. Although Father and Mother either refused to answer questions about their drug use or denied using drugs, Burgess would not allow them to pick up the children from daycare until they completed a drug test. Both parents tested positive for marijuana; Father's mother refused to complete a drug test. Although the children had been returned to their parents almost three months earlier, Father

---

[2] The children's paternal grandmother has been known by different names, and the Department's background check of one name did not reveal information recorded under another name.

told a psychologist that he used marijuana in February 2017 because "he 'was celebrating' the close of his CPS case."[3]

## C.  Events During the Children's Second and Third Placements

Due to Father's and Mother's continuing drug use, the children initially were returned to their maternal grandmother; however, the maternal grandmother already was caring for Mother's two older children and found it too difficult to care for all four children. Jerry and Nadine therefore were placed with the family of a maternal cousin in Louisiana in March 2017.

Father entered into a new service plan that required him to "maintain stable and secure housing that is free of drugs, alcohol, and domestic violence" and to attend Alcoholics Anonymous or Narcotics Anonymous at least three times a week. That summer, Father received an eviction notice, but he had not yet been dispossessed when Hurricane Harvey caused water damage to the residence in August 2017.[4] FEMA then paid for Father and Mother to live in a motel. Father testified at trial that he has since paid his former landlord all of the rent that was owed.

In October 2017, Father, Mother, the children, the children's maternal grandmother, and the children's guardian ad litem Kimberly Marshall celebrated Jerry's birthday at a McDonald's restaurant in Texas. Marshall testified that Father "show[ed] up at the birthday party at McDonald's with Jack and Coke in his cup." She did not ask that CPS test Father for alcohol because Father admitted that he was drinking; the children's maternal grandmother similarly testified that Father

---

[3] "CPS" is the acronym used for Child Protective Services. Family-Based Safety Services are offered through CPS.

[4] It is unclear whether he received the eviction notice before or after the hurricane.

4

admitted drinking at this party. At trial, Father denied that he had been drinking alcohol and stated that he quit drinking in July 2017.

**D.      Events During the Children's Fourth Placement**

In January 2018, the children were moved to the home of Mother's sister in Texas. The children's aunt testified that when Jerry arrived, he had been shy and his speech had been slightly delayed, but "after he kind of came out of his shell, he started talking a lot more." She further testified that she plans to adopt the children, just as she adopted a young cousin who first began living with her through a similar kinship placement.

In the time since the children have been living with their aunt, Father has been arrested twice: once for driving while intoxicated, and once for domestic violence.

The charges for driving while intoxicated were dropped, but Deputy Thomas Liles of the Brazoria County Sheriff's Department testified at trial to the circumstances of the arrest. Liles stated that he observed Father driving in two lanes—"down the dotted lines"—and traveling at a speed of 15 miles per hour in a 30-miles-per-hour zone. During the traffic stop, Liles noticed a strong odor of burnt marijuana coming from the inside of the vehicle. Father was asked to step outside, and according to Liles, Father could barely walk. As Liles described the scene, Father had difficulty putting on a shoe and had to hold onto the vehicle to stand. Although no illicit narcotics were found in the vehicle, officers found what appeared to be the small burnt end of a marijuana cigarette but did not collect it. A different officer arrested Father for driving while intoxicated, and Liles arrested Mother, who also was present, for an outstanding warrant. While being transported to jail, Mother admitted on camera that she and Father both had been smoking synthetic marijuana that day.

Father's version of events was markedly different. He testified that when he was arrested, the car actually had been stopped. He stated that he could not recall his physical condition at the time of the arrest, but that he was not alert. When asked what he was doing when the police approached him, Father testified, "I guess I had passed out." He denied that he had been using drugs but stated that he had taken some sleep aid medication.

Two weeks after his arrest for driving while intoxicated, Father was arrested for assaulting Mother. Deputy Rachel Houston of the Brazoria County Sheriff's Department testified that Father and Mother's neighbor had called to report a man and woman arguing outside the residence. When officers arrived, Mother was not there, but Father stated that Mother "was being crazy" and hadn't slept for days. Houston referred Father to the mental-health officer on duty. Later that day, Father called for help. He stated that he was riding in the back of a pickup truck driven by Mother, who was driving recklessly and would not stop. When Houston located Father, he was standing next to the truck and Mother was walking down the road in the rain. Father stated that he had looked for Mother and found her at a convenience store, and when she tried to leave in his pickup truck, he jumped in the back. Houston spoke to Mother, who reported that Father had been up smoking synthetic marijuana all night and she wanted him out of the house. She stated that Father had thrown her to the ground, but Houston found no marks or bruises on Mother or Father; Mother's mother later testified, however, that Mother showed her bruises on her arm and the back of her leg that Mother said were from that incident. Houston arrested Father for assault by contact, and Mother obtained a protective order. Father then moved in with his mother.

The trial court also heard testimony about Father and Mother's monthly visits with the children, which usually take place at their maternal grandmother's house.

The children's grandmother testified that up until a few months earlier, Father and Mother would sometimes go out to Father's truck during visitation and become intoxicated. She stated that she did not feel comfortable allowing Father and Mother around the children in that condition, and that she warned Father and Mother, "if that's what they're going to do, then they need to leave." Nevertheless, she did not in fact ask them to leave, and she stated that Father had not appeared intoxicated in the most recent three or four visits before trial.

Sometime during this period, Father voluntarily completed a 21-day drug rehabilitation program. Father denies that he used drugs after February 2017, but he stated that he believed voluntarily completing such a program would help in obtaining his children's return. The children's maternal grandmother testified that she has seen Father feed the children and change diapers; that he plays with the children; that the children are excited to see him; and that she has no knowledge of the children ever being harmed or malnourished in his care. She concluded, "As long as [Father] is not on any type of drugs or drinking, he's not a danger to them."

Finally, the aunt with whom the children reside described an incident that had taken place at Nadine's second birthday party, which, according to their maternal grandmother, took place just five days before trial. The party was held at a house with a pool. The children's aunt, who was responsible for the children, wanted to go into the house for a piece of cake. Mother and Father were in the pool area with the children, and Father told the aunt that he was watching the children. The children's aunt went into the house and returned in time to see Nadine fall into the pool. The children's aunt grabbed Nadine's arm and pulled her out of the pool. As the aunt testified at trial, Father responded, "I'm sorry, [Mother] distracted me." The children's aunt expressed regret for leaving the children with their parents for even

7

a few seconds and testified that she would not allow visitation if permitted to adopt the children.

The trial court rendered judgment terminating Mother's and Father's parental rights and appointing the Department as permanent managing conservator. Father brings this accelerated appeal challenging the termination of his parental rights.

## II. STANDARD OF REVIEW

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *See In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980); *In re S.R.*, 452 S.W.3d 351, 357 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Although parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). The child's emotional and physical interests must not be sacrificed merely to preserve the parent's rights. *Id.*

The party seeking to terminate a person's parental rights bears the burden of proof. *In re L.M.I.*, 119 S.W.3d 707, 720 (Tex. 2003). Due to the severity and permanency of the termination of parental rights, the burden of proof is heightened to clear and convincing evidence. TEX. FAM. CODE § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007; *In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a heightened standard of review. *In re S.R.*, 452 S.W.3d at 358.

In reviewing the legal sufficiency of the evidence in a termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that its finding was true. *See In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009); *In re J.F.C.*,

8

96 S.W.3d at 266. We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence a reasonable factfinder could have disbelieved. *In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266.

In reviewing the factual sufficiency of the evidence, we consider and weigh all the evidence, including disputed or conflicting evidence. *See In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.*, 96 S.W.3d at 266. We do not substitute our own judgment for that of the factfinder but give due deference to its findings. *See In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). The factfinder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id*. at 109. We are not to "second-guess the trial court's resolution of a factual dispute by relying on evidence that is either disputed, or that the court could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d at 712.

### III. PREDICATE TERMINATION GROUNDS

Parental rights can be terminated upon clear and convincing evidence that (a) the parent has committed an act described in section 161.001(b)(1) of the Family Code and (b) termination is in the best interest of the child. TEX. FAM. CODE § 161.001(b)(1), (2); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). Only one predicate finding under section 161.001(b)(1) is necessary to support a decree of termination when termination is in the child's best interest. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

Father's parental rights were terminated on the following statutory grounds:

9

(b)     The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence:

(1)     that the parent has:

. . .

(D)     knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;

(E)     engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;

. . .

(O)     failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child . . . .

TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (b)(1)(E), (b)(1)(O).  On appeal, Father argues that the evidence is legally and factually insufficient to support the trial court's findings that (a) he failed to comply with the court-ordered family service plan as described in subsection (b)(1)(O), and (b) termination of his parental rights is in the children's best interest.

By failing to challenge the trial court's findings under sections 161.001(b)(1)(D) and 161.001(b)(1)(E), Father has tacitly conceded that the evidence is sufficient to support those findings.  *See In re T.C.*, No. 07-18-00080-CV, 2018 WL 4039426, at *5 (Tex. App.—Amarillo Aug. 23, 2018, pet. denied) (mem. op.).  Unchallenged findings of fact are binding on an appellate court "unless

10

the contrary is established as a matter of law, or if there is no evidence to support the finding." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986).

The record supports the trial court's findings of endangerment under subsections (b)(1)(E). Under this provision, courts may consider conduct both before and after the Department removed the children from the home. *See In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). And endangering conduct is not limited to actions directed toward the child. *See In re J.O.A.*, 283 S.W.3d at 345. A parent's continuing substance abuse can qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being. *See J.O.A.*, 283 S.W.3d at 345; *In re S.R.*, 452 S.W.3d at 361. By using drugs, a parent exposes the child to the possibility that the parent may be impaired or imprisoned and, therefore, unable to take care of the child. *See Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617–18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Continued illegal drug use after a child's removal is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct. *Cervantes–Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253–54 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (en banc).

Given the evidence of illegal substance abuse both before the children's removal and during their brief return, as well as the statements by Mother to law-enforcement personnel and the testimony of the children's maternal grandmother regarding Father's continued substance abuse after the children again were removed from the home, we conclude that the record supports Father's tacit admission that he endangered the children's well-being as described in subsection E. It is therefore unnecessary for us to consider whether the evidence supports the trial court's finding regarding subsection D or to address Father's arguments concerning subsection O.

11

## IV. THE CHILDREN'S BEST INTEREST

In considering whether the evidence is sufficient to support a finding that the termination of parental rights is in a child's best interest, courts consider the non-exhaustive list of factors set forth in *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors include (a) the child's desires, (b) the child's present and future emotional and physical needs, (c) the present and future emotional and physical danger to the child, (d) the parental abilities of the individuals seeking custody, (e) the programs available to assist those individuals to promote the child's best interest, (f) the plans for the child by those individuals or by the agency seeking custody, (g) the stability of the home or the proposed placement, (h) the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one, and (i) any excuse for the parent's acts or omissions. *See id.* The absence of evidence about some of these factors does not preclude a factfinder from reasonably forming a firm conviction or belief that termination is in a child's best interest. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). To the contrary, evidence of only one factor may be sufficient to support termination. *See In re S.J.R.-Z.*, 537 S.W.3d 677, 692 (Tex. App.—San Antonio 2017, pet. denied) (op. on reh'g).

The Family Code also sets out additional factors to be considered in evaluating a parent's willingness and ability to provide the child with a safe environment. These include, *inter alia*, the child's age and physical and mental vulnerabilities; the frequency and nature of out-of-home placements; whether there is a history of substance abuse by the child's family or those who have access to the child's home; whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable

12

time; and whether the child's family demonstrates adequate parenting skills.  TEX. FAM. CODE ANN. § 263.307(b).

## A.     The Children

Jerry and Nadine were, respectively, three and two years old at the time of trial.  When children are too young to express their desires, the factfinder may consider whether the children have bonded with the family with whom they are placed, whether the children are well cared-for by them, and whether the children have spent minimal time with the parent.  *In re. L.G.R.*, 498 S.W.3d at 205.

At the time of trial, Jerry had spent nearly half of his life in out-of-home placements, and Nadine has lived almost entirely with relatives other than her parents.  There is no evidence that the children have any special needs, and their aunt testified that the children are current on all medical and dental check-ups.  The trial testimony indicates that the children are happy and thriving living with their aunt, who plans to adopt them.

## B.     Father

We already have discussed Father's continuing substance abuse, and the same evidence is probative of endangerment in our best-interest analysis.  *See In re C.H.*, 89 S.W.3d at 28.  Although Father points to testimony that he always passed his monthly drug tests, the evidence is conflicting.  During a psychological consultation on May 26, 2017, Father stated that he hadn't been given a drug test since February 2017, and he admits that he tested positive at that time.  The trial court reasonably could have found the testimony of Father's continuing substance abuse to be the more credible.

Evidence of criminal conduct, convictions, or imprisonment is relevant to a review of whether a parent engaged in a course of conduct that endangered the well-

being of the child. *See In re S.R.*, 452 S.W.3d at 360–61. In addition to Father's drug-related criminal conduct, he was arrested for assaulting Mother after the children's removal. And were the children returned to him, he would not be the only one in the home with a such a criminal history; Father now lives with his mother, who also has a history of substance abuse and assault.

As further evidence of endangerment and of Father's parenting abilities, just five days before trial, Father failed to prevent Nadine from falling into a pool at her birthday party. At trial, he maintained that supervising the children was their aunt's responsibility.

But perhaps the strongest evidence of endangerment is the note in Father's psychological evaluation that Father explained his February 2017 substance abuse by stating that he was celebrating the end of this case. This suggests that Father's goal has been to moderate his drug use only while the Department is watching. This inference is further supported by some of his trial testimony. When asked if he believed his methamphetamine use was bad for the children, Father agreed, but he qualified his answer by adding "if it's habitual and it's steady use and you don't change your ways." And when asked if his multiple arrests and his use of synthetic marijuana were bad for the children, Father answered, "It's all bad but my present situation what I have been going through, I am surprised I haven't done worse."

We conclude that the record evidence is both legally and factually sufficient to support the trial court's best-interest finding.

## V. Conclusion

We affirm the trial court's judgment.

/s/     Tracy Christopher
Justice

Panel consists of Justices Christopher, Hassan, and Poissant